# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

———————————————————

| | |
|---|---|
| JENNIFER KRAVITZ, and NORMAN SEABROOK, ISRAEL REXACH, ELIAS HUSAMUDEEN, WILLIAM WASNICKI, GUY ANDERSON, ROBERT SEABROOK, and STEVEN ROBINSON, as Trustees for and on behalf of the CORRECTION OFFICERS BENEVOLENT ASSOCIATION SECURITY BENEFITS FUND - RETIREES and THE CORRECTION OFFICERS BENEVOLENT ASSOCIATION SECURITY BENEFITS FUND - ACTIVE and FLORIDA ADVOCATES FOR CONSUMER TRUTH, on behalf of themselves and all other Persons and entities Similarly Situated, | : : : : : : : : : : : : : : : : NO. : : : |
| Plaintiffs, | : : |
| vs. | : CLASS ACTION COMPLAINT : AND DEMAND FOR JURY TRIAL |
| | : |
| GLAXOSMITHKLINE, PLC and SMITHKLINE BEECHAM CORPORATION, d/b/a GLAXOSMITHKLINE, INC. | : : : |
| | : |
| Defendants | : |

———————————————————

Plaintiffs, JENNIFER KRAVITZ, TRUSTEES OF THE CORRECTION OFFICERS

BENEVOLENT ASSOCIATION SECURITY BENEFITS FUNDS ACTIVE AND RETIRED

("COBA Funds") and FLORIDA ADVOCATES FOR CONSUMER TRUTH , on behalf of

themselves and all other persons and entities similarly situated, by and through their undersigned

attorneys, bring this civil action against Defendants GlaxoSmithKline, plc and Smithkline

Beecham Corporation d/b/a GlaxoSmithKline, Inc. ("GSK"), for injunctive relief and damages

as a result of defendants' violation of the federal antitrust laws and the deceptive practices statutes of 20 states and the District of Columbia and allege, upon information and belief, as follows:

## NATURE OF THE ACTION

1.    This action is brought under the federal antitrust statutes and/or the deceptive practices statutes of twenty (20) states and the District of Columbia to remedy defendants' anti-competitive activities.

2.    Augmentin®  which is manufactured and marketed by Defendants, is a widely prescribed antibiotic and is approved by the United States Food and Drug Administration (the "FDA") for the treatment of infections.

3.    Since 1984, defendant GSK, and its predecessors have manufactured and sold Augmentin®.  GSK received more than $2 billion in 2001 from the sale of Augmentin.

4.    This case arises out of GSK's efforts to unlawfully create and maintain a patent monopoly in the U.S. market for amoxicillin and potassium clavulante-based prescription drugs. More specifically, in order to extend its patent for Augmentin, defendants made material misrepresentations to the U.S. Patent and Trademark Office ("PTO") by improperly filing duplicative patents for inventions already protected by GSK, in prior patents.   These original patents included U.S. patent No. 4,144,242 ("the '242 patent") issued March 13, 1979; U.S. patent No. 4,367,175 ("the '175 patent") issued January 4, 1983; U.S. patent No. 4,490,294 ("the '294 patent") issued December 25, 1984; and U.S. patent No. 4,490,295 ("the '295 patent") issued December 25, 1984. GSK subsequently filed sham double patents designed to unlawfully extend its patent protection of Augmentin.  Thus, from their inception, these double patents filed

by GSK,  were invalid and unenforceable.  Nevertheless, defendants listed these invalid patents with the U.S. Food and Drug Administration's ("FDA") Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book").  Thereafter, defendants sought to protect their unlawfully obtained patents against challenge from generic manufacturers of amoxicillin and potassium clavulante-based prescription drugs through threats to enforce these sham patents.

5.    The United States District Court of the Eastern District of Virginia ("District Court")  has held that each of these unlawfully obtained patents are invalid, in orders dated October 14, 2001, March 13, 2002 and May 23, 2002. These rulings resulted from patent litigation instituted against defendants by generic manufacturers, Geneva Pharmaceuticals, Inc. ("Geneva"),  Teva Pharmaceuticals, Inc.("Teva") and Ranbaxy Pharmaceuticals ("Ranbaxy").

6.    Defendants' unlawful, anti-competitive conduct has resulted in the price of Augmentin® being fixed at artificially high and supra-competitive levels.  Additionally, plaintiffs and the other members of the class were deprived of the opportunity to purchase generic amoxicillin and potassium clavulante-based prescription drugs.  Accordingly, but for defendants' unlawful activity, class members would have paid less money for amoxicillin and potassium clavulante-based prescription drugs.

7.    Plaintiffs bring this claim on behalf of all end-payers, *i.e.* consumers and third-party payers, the last persons and entities in the chain of distribution, who purchased Augmentin® other than for resale from December 25, 2001 to the present (the "class period").

8.    Plaintiffs seek a judgment declaring defendants' conduct unlawful under § 2 of the Sherman Act, 15 U.S.C. § 2, and pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26,

enjoining continuation of defendants' monopolistic practices.

9.      Neither plaintiffs nor the Class seek any relief under § 4 of the Clayton Act, 15 U.S.C. § 15.

10.     Plaintiffs and the Class seek damages and equitable relief for defendants' violations of the antitrust and/or deceptive practice statutes of Arizona, California, District of Columbia, Florida, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin (collectively the "Indirect Purchaser States").

11.     Plaintiffs and the Class seek equitable remedies as to defendants' unjust enrichment.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § § 1331, 1337 and 1367 and § 16 of the Clayton Act, 15 U.S.C. § 26.

13.     Pursuant to the provisions of 15 U.S.C. § 22 and 28 U.S.C. § 1391, venue is properly laid in this judicial district because, defendants transact business, maintain offices or are found within this judicial district.  Furthermore, the interstate commerce described below was, and is carried on, in part, within this judicial district and the monopolization and other wrongful conduct alleged in this Complaint was carried out, in part, within this judicial district.

## PARTIES

14.     Plaintiff Jennifer Kravitz is a resident of Montgomery County, Pennsylvania. Plaintiff purchased Augmentin® manufactured by defendants, during the proposed Class Period.

15.     Plaintiff, COBA Funds are entities located in New York, New York.   The Funds

4

provide prescription drug coverage for over 10,000 participants and beneficiaries in New York and, with respect to the Retirees Fund, across the United States. At various times, the Fund has paid for the purchase, other than resale, of various drugs, administered to participants and beneficiaries of the Fund, specifically paying for the purchase of Augmentin® during the proposed Class Period.

16.    Plaintiff, Florida Advocates for Consumer Truth ("F.A.C.T"). is a non-profit organization, and is located in Coral Springs, Florida.   F.A.C.T. has standing to bring suit for injunctive relief on behalf of its members, one or more of which has purchased and/or paid for Augmentin® during the class period and who individually would have standing to sue in their own right. The interests at stake in this litigation are germane to F.A.C.T.'s purpose and neither the claims asserted nor the injunctive relief requested requires the participation of individual members in this lawsuit.

17.    Defendants GlaxoSmithKline, plc and Smithkline Beecham Corporation d/b/a GlaxoSmithKline, Inc., are Pennsylvania corporations with a principal place of business at One Franklin Plaza, Philadelphia, Pennsylvania.  Defendants and their predecessors manufacture and distribute pharmaceuticals including Augmentin®.

18.    The acts charged in this Complaint as having been done by the defendants were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management of the defendants' business or affairs.

**INTERSTATE COMMERCE**

19.    Defendants manufacture, distribute and sell Augmentin® in a continuous and uninterrupted indirect flow to the end-user plaintiffs and the Class and Subclass they represent.

5

Augmentin® is manufactured and sold by GSK throughout the United States where it is used as a prescription medication used to fight bacterial infections.

20.     During the entire Class Period, defendants sold and shipped substantial quantities of Augmentin® in a continuous and uninterrupted flow in interstate commerce to customers located in states other than the states in which GSK manufactured Augmentin®.

21.     In addition, throughout the Class Period, in connection with the purchase and sale of Augmentin®, monies, as well contracts, bills and other forms of business communication and transactions, were transmitted in a continuous and uninterrupted flow across state lines.

22.     The business activities of GSK that are the subject of this Complaint were within the flow of, and substantially affected, interstate trade and commerce.

## CLASS ACTION ALLEGATIONS

23.     Plaintiffs bring this action as a class action, pursuant to Federal Rule of Civil Procedure 23(a) on behalf of the following class:

> All end-user persons and entities who purchased, within the United States, Augmentin® manufactured by GSK, at any time during the period from December 25, 2001 to the present (the "Class").

> All end-user persons and entities in the United States who purchased Augmentin® at any time during the period from December 25, 2001 to the present in Arizona, California, District of Columbia, Florida, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin (the "21-Jurisdiction End-User Subclass").

Excluded from the Class and Subclass are GSK, its subsidiaries and affiliates, and government entities. For purposes of this class definition, persons and entities "purchased" Augmentin® if they paid some or all of the purchase price.

6

24.     Plaintiffs do not, as yet, know the exact size of the Class.  However, based upon the nature of the trade and commerce involved, plaintiffs believe that the total number of Class members is in the thousands, if not hundreds of thousands, and that Class members are geographically dispersed throughout the United States.  For that reason, joinder of all members of the Class is not practicable.

25.     There are questions of law and/or fact common to the Class which predominate over any questions affecting only individual members of the Class.  Such common questions include, without limitation, the following:

      a.     the definition of the relevant market for analyzing defendants' monopoly power;

      b.     whether defendants had monopoly power in the relevant market;

      c.     whether defendants illegally obtained such monopoly power;

      d.     whether defendants illegally maintained monopoly power in the relevant market;

      e.     whether competition has been restrained as a result of the alleged misconduct;

      f.     whether defendants engaged in the filing of sham patents;

      g.     whether the unlawful conduct of defendants caused a delay of the manufacture and marketing of generic amoxicillin and potassium clavulante-based prescription drugs from December 25, 2001 to the present;

      h.     whether plaintiffs are entitled to declaratory and injunctive relief; and

i.      whether plaintiffs and the Class members paid more for Augmentin®

than                        they would have had to pay in a competitive market place, unfettered by

defendants' unlawful, fraudulent, unfair and anti-competitive conduct.

26.     Plaintiffs are members of the Class, plaintiff COBA Funds are members of the

Subclass and Plaintiffs' claims are typical of the claims of the Class and Subclass members.

Plaintiffs will fairly and adequately protect the interests of the Class and Subclass.  The interests

of the named plaintiffs are coincident with, and not antagonistic to, those of the other members

of the Class and Subclass.  Plaintiffs have retained counsel who are experienced in the

prosecution of antitrust and unfair competition class actions, and plaintiffs will vigorously

prosecute this case on behalf of the Class and Subclass.

27.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.  A class action would allow plaintiffs and the Class members to

pursue claims that would be uneconomical to pursue individually.  The Class is readily definable

and is one for which records should exist.  Prosecution as a class action will eliminate the

possibility of repetitious litigation or inconsistent judgments.

## RELEVANT MARKET

28.     To the extent applicable to the claims alleged herein, the relevant product market

is the market for the manufacture and sale of amoxicillin and potassium clavulante-based

prescription drugs, including Augmentin® and generic versions of Augmentin®.

29.     The relevant geographic market is the United States for Counts I and III and the

Indirect Purchaser States for Count II.

30.      Geneva is the current holder of an "Abbreviated New Drug Application"

8

("ANDA"), filed on February 11, 2000, and assigned to it from Biochemie GmbH ("Biochemie") which initially sought approval from the FDA to manufacture and market generic forms of Augmentin®. On April 18, 2002, Geneva was provided with final approval by the FDA to start selling a generic version of Augmentin®. Geneva has made substantial preparation in the United States to market and sell generic versions of Augmentin®.

31.    As a result of defendants' threats to seek damages from any generic manufacture of amoxicillin and potassium clavulante-based prescription drugs, the generic version of Augmentin® was kept off the market. Generic versions of Augmentin® could have been placed on the market by December 25, 2001. The market share in the relevant market was at all relevant times 100%.

## **BACKGROUND**

### A.    **The Federal Regulatory Scheme for Generic Drugs**

32.    In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act 1984, Pub. L. No. 98-417, 98 Stat. 1585  (the "Hatch-Waxman Amendments"), amending the Federal Food, Drug, and Cosmetics Act, 21 U.S.C. §§ 301-392.  Under the Food, Drug, and Cosmetic Act, drug manufacturers must obtain FDA approval for any new drug by filing a New Drug Application ("NDA"), which requires the submission of specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.

33.    The FDA lists patents which apply to the new drug - the "pioneer drug" - in its publication known as the Approved Drug Products With Therapeutic Equivalence Evaluations, typically referred to as the "Orange Book."  To be properly listed in the Orange Book, the patent

9

must meet two statutory requirements.  First, the patent must "claim the drug" or "a method of using such drug."  Second, the patent must be such that "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug."  21 U.S.C. §§ 355(b) and 355(c)(2).

34.    The Hatch-Waxman Amendments provide that companies may seek approval to produce and market a generic form of a previously approved, or "pioneer" drug by filing only an ANDA that relies on the safety and effectiveness findings reported in the NDA for the previously approved drug.  One of Congress' central goals in enacting the Hatch-Waxman Act and the ANDA provision was "to bring generic drugs onto the market as rapidly as possible."  Nova Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1068 (D.C. Cir. 1998).

35.    The ANDA must include information concerning the generic drug company's position with respect to the patent for the previously approved drug, and must include one of four certifications:

> I.     that no patent for the pioneer drug has been filed with the FDA (a "Paragraph I Certification");
>
> II.    that any patent listed in the FDA Orange Book for the pioneer drug has expired (a "Paragraph II Certification");
>
> III.   that the patent for the pioneer drug will expire on a particular date and the generic drug company does not seek to market its generic product before that date (a "Paragraph Certification"); or
>
> IV.    that the patent for the pioneer drug is invalid or will not be infringed upon by the generic drug company's proposed product (a "Paragraph IV Certification").

36.    If the ANDA does not address all of the patents listed for a drug in the Orange Book by means of one of the above four certifications, the FDA will not approve the generic

10

drug for sale.

37.     Generic drugs are priced at a significant discount from the price of the brand name version, typically from 30 to 50 percent below the brand name price.  Where there is competition from more than one generic manufacturer in the market, prices decrease even further, and the brand-name version loses market share - often up to 80% -- to the generic manufacturers.  Absent entry by generic manufacturers, there is little price competition.

38.     The doctrine of double patenting seeks to prevent the unjustified extension of patent exclusivity beyond the term of a patent. *Manual of Patent Examining Procedure*, §804,  p. 800-11 (7th ed. 2001).

39.     Obviousness-type double patenting requires rejection of an application claim when the claimed subject matter is not patentably distinct from the subject matter claimed in a commonly owned patent when the issuance of a second patent would provide unjustified extension of the term of the right to exclude granted by a patent. *Manual of Patent Examining Procedure*, §804 p.800-22 (7th ed. 2001).  Put another way, an invention (or drug) cannot be patented twice.

   **B.     GSK's Brand-Name Version of Amoxicillin and Potassium Clavulante-based Prescription Drugs: Augmentin®**

40.     Augmentin®, the brand name version of amoxicillin and potassium clavulante-based prescription drugs, is a widely prescribed medication for bacterial infection.  During the year 2001 GSK received more than $2 billion from the sale of Augmentin®.

41.     Defendants initially filed patent applications for its amoxicillin/potassium clavulante-based prescription drugs in  in approximately 1975. By 1983 and 1984, defendants procured the '242 patent, the '175 patent, the '294 patent and the '295 patent. These patents

expired on March 13, 1996, January 4, 2000, December 25, 2001 and December 25, 2001 respectively.

42.    Since September 1984, GSK has marketed and sold Augmentin®, directly and indirectly, in the United States.

43.    Subsequent to 1984, GSK submitted New Drug Applications to the FDA in order to market and sell Augmentin. Specifically, GSK filed the following sham patents, each of which have now been judicially determined to be invalid for double patenting:

a) U.S. patent No. 4,525,352 ("the '352 patent") issued June 25, 1985;

b) U.S. patent No. 4,529,720 ("the '720 patent") issued July 16, 1985;

c) U.S. patent No. 4,560,552 ("the '552 patent") issued December 24, 1985.

These patents were to have expired on June 25, 2002, July 16, 2002 and December 24, 2002, respectively.

44.    The FDA approved GSK's NDAs for Augmentin®, on the above patents. Consequently, the patents were listed in the FDA's Orange Book.  In receiving FDA approval and listing in the Orange Book, GSK affirmatively represented that the '352, '720 and '552 patents for Augmentin were valid and enforceable, when in fact the patents were invalid and unenforceable for double patenting, as a result of defendant's intentional material misrepresentations to the PTO.

45.    A number of years later, on February 11, 2000  Biochemie filed ANDAs with the FDA in order to market and sell generic versions of Augmentin®, and almost immediately, GSK sought to unlawfully extend patent protection for Augmentin® by filing four more sham patents, each of which has also now been judicially determined to be invalid for double-patenting:

a) U.S. patent No. 6,031,093 ("the '093 patent") issued February 29, 2000;

b) U.S. patent No. 6,048,977  ("the '977 patent") issued April 11, 2000;

c) U.S. patent No. 6,051,703 ("the '703 patent") issued April 18, 2000.

d) U.S. patent No. 6,218,380 ("the '380 patent") issued April 17, 2001;

These patents would extend GSK's exclusivity for Augmentin® through 2018.

46.    As the holder of an ANDA, Geneva then filed a complaint for Declaratory Judgment, seeking a determination that the following patents were invalid for double patenting: '093, '977, '703, '380, '352, '720 and '552. Geneva's case was consolidated with similar Declaratory Judgment actions filed by generic manufacturers Teva and Ranbaxy.

47.    On December 14, 2001, the District Court held  the '380 patent  invalid on the ground of obviousness-type double patenting. In its written opinion, the district court found that the '380 patent, which claimed the use of Augmentin, was indistinguishable from the '720 patent, which claimed Augmentin itself.  *Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline, plc,* 189 F.Supp.2d 377, 384 (E.D.Va.2002). On March 13, 2002, that same court similarly found patents '093, '977 and '703 all invalid for obvious double patenting. Finally, following a Bench Trial, on May 23, 2002, the District Court held the remaining patents, '552, '352 and '720, all invalid on the grounds of double patenting. Thus, the last remaining valid patents, '294 and '295, expired on December 25, 2001.

## ANTI-COMPETITIVE EFFECTS

48.    Defendants' unlawful exclusionary conduct has prevented competition in the market for amoxicillin and potassium clavulante-based prescription drugs. Defendants have appealed the judgments of the court and has threatened to seek damages against any generic

13

manufacturer if generic Augmentin® were to be marketed.  As a result, defendants sold Augmentin® without any competition from generic versions of the drug.  Additionally, defendants' conduct prevented competitors from selling generic versions of Augmentin® after the expiration of the remaining valid patent, on December 25, 2001.

49.    The prices for Augmentin® have been fixed, raised, maintained or stabilized at artificially high and noncompetitive levels.

50.    Buyers of Augmentin® have been deprived of the benefits of free and open competition in their purchases.

51.    Competition in the production and sale of Augmentin® and its generic equivalents has been restrained, suppressed and eliminated.

52.    Plaintiffs and the other Class and Subclass members paid more for the Augmentin® that they purchased than they would have had to pay under conditions of free and unrestricted competition.

53.    As a direct and proximate result of GSK's wrongful conduct, GSK has wrongfully profited and obtained substantial monies from plaintiffs and the members of the Class and Subclass.

## COUNT I

**FOR DECLARATORY AND INJUNCTIVE RELIEF
UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS
OF SECTION 2 OF THE SHERMAN ACT**

54.    Plaintiffs incorporate by reference Paragraphs 1 through 53 as though fully set forth herein.

55.    This Count is brought by plaintiffs on behalf of the Class.

14

56.     Section 2 of the Sherman Act states that it is illegal to monopolize, or attempt to monopolize any part of interstate trade or commerce.

57.     From at least December 25, 2001, GSK possessed 100% monopoly power in the market for the manufacture and sale of amoxicillin and potassium clavulante-based prescription drugs including Augmentin® and its generic versions, in the United States.  But for defendants' unlawful anti-competitive conduct, as alleged herein, defendants would have never obtained monopoly power in the relevant market.

58.     Defendants knowingly and willfully acquired and maintained its monopoly power through unlawful conduct including fraudulently obtaining the '093, '977, '703, '380, '352, '720 and '552, patents from the PTO and making affirmative misrepresentations to the FDA in order that the patents could be listed in the FDA Orange Book.

59.     Defendants maintained these sham patents for the anti-competitive purpose of delaying the introduction of generic versions of Augmentin® into the market.

60.     Defendants' repetitive filing of sham patents were and are part of a policy to prevent manufacturers of generic drugs from marketing a generic form of Augmentin®.

61.     Defendants' threats to bring legal action for monetary damages from generic manufacturers of  amoxicillin and potassium clavulante-based prescription drugs which seek to market the drugs, are part of defendants' continuing policy to prevent manufacturers of generic drugs from marketing a generic form of Augmentin®.

62.     In sum, defendants' bad faith conduct was done with the intent and purpose, and had the effect, of obtaining and maintaining monopoly power and restraining competition in the relevant market.

63.     While obtaining and possessing unlawful monopoly power in the market for Augmentin®, defendants fixed, maintained, and raised the price of Augmentin® to artificially high and/or supra-competitive levels.

64.     Plaintiffs and the other members of the Class were injured in their business or property by reason of GSK's antitrust violation alleged in this Cause of Action.  Their injury consists of paying higher prices for amoxicillin and potassium clavulante-based prescription drugs than they would have paid in the absence of that violation.  Their injury is of the type the antitrust laws were designed to prevent and flows from that which makes GSK's conduct unlawful.

65.     Pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), plaintiffs and the Class are entitled to a declaration that defendants' monopolization and attempts to monopolize the market for Augmentin® and its generic equivalents violated §2 of the Sherman Act.

66.     Plaintiffs and the Class are entitled to an injunction pursuant to §16 of the Clayton Act enjoining defendants' continued monopolistic practices.

67.     Plaintiffs and the Class have no adequate remedy at law.

## COUNT II

### FOR DAMAGES UNDER THE ANTITRUST AND DECEPTIVE PRACTICES STATUTES OF THE INDIRECT PURCHASER STATES

68.     Plaintiffs repeat and incorporate herein by reference paragraphs 1 through 67 of this Complaint as if fully set forth herein.

69.     This Count is brought by plaintiffs COBA Funds on behalf of the 21-Jurisdiction End-User Subclass.

16

70.    GSK's intentional and wrongful acquisition and maintenance of its monopoly power in the relevant market, as alleged herein, violates the following antitrust and/or deceptive practice Indirect Purchaser statutes:

    a.    Arizona Revised Stat. § § 44-1401, et seq. with respect to purchases of Augmentin® in Arizona by members of the 21 Jurisdiction End-User Subclass;

    b.    The Cartwright Act, California Business and Professions Code Section 16700 et seq. and/or the California Unfair Competitions Act, California Business and Professions code Sections 17200 et seq. with respect to purchases of Augmentin® in California by members of the 21 Jurisdiction End-User Subclass;

    c.    D.C. Code Ann. §§ 28-4501 et seq., with respect to purchases of Augmentin® in the District of Columbia by members of the 21 Jurisdiction End-User Subclass;

    d.    Fla. Stat. § § 501.201, et seq., (the Florida Unfair and Deceptive Trade Practices Act), with respect to purchases of Augmentin® in Florida by members of the 21 Jurisdiction End-User Subclass;

    e.    Kan. Stat. Ann. §§ 50-801(b) and 50-101, et seq., with respect to purchases of Augmentin® in Kansas by members of the 21 Jurisdiction End-User Subclass;

    f.    Louisiana Revised Statutes § 51:137 with respect to purchases of Augmentin® in Louisiana by members of the 21 Jurisdiction End-User Subclass;

    g.    Maine Revised Statutes Annotated 10 M.S.R.A § 1101, et seq., and/or Maine's Unfair Trade Practices Act, 5 M.S.R.A. § 205-A, et. seq. with respect to purchases of Augmentin® in Maine by members of the 21 Jurisdiction End-User Subclass;

    h.    Massachusetts Consumer Protection Act, Mass. Gen. Laws, ch. 93A, et seq. with respect to purchases of Augmentin® in Massachusetts by members of the 21 Jurisdiction End-User Subclass;

    i.    Michigan Antitrust Reform Act, MCL § 445.771, et seq., and/or the Michigan Consumer Protection Act, MCL § 445.901, et. seq., with respect to purchases of Augmentin® in Michigan by members of the 21

Jurisdiction End-User Subclass;

j.      Minnesota Antitrust Act of 1961, Minn. Stat §§ 325D.49, et seq., with respect to purchases of Augmentin® in Minnesota by members of the 21 Jurisdiction End-User Subclass;

k.      Nevada Unfair Trade Practice Act, NRS 598A, et. seq., with respect to purchases of Augmentin® in Nevada by members of the 21 Jurisdiction End-User Subclass;

l.      New Jersey Consumer Fraud Act, N.J. Stat. Ann. § § 56:8-1, et seq., with respect to purchases of Augmentin® in New Jersey by members of the 21 Jurisdiction End-User Subclass;

m.      New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases of Augmentin® in New Mexico by members of the 21 Jurisdiction End-User Subclass;

n.      The Donnelly Act, N.Y. General Business Law § 340 et seq., with respect to purchases of Augmentin® in New York by members of the 21 Jurisdiction End-User Subclass;

o.      North Carolina Gen. Stat. §§ 75-1, et seq., with respect to purchases of Augmentin® in North Carolina by members of the 21 Jurisdiction End-User Subclass;

p.      North Dakota Cent. Code §§ 51-08.1-01, et seq., with respect to purchases of Augmentin® in North Dakota by members of the 21 Jurisdiction End-User Subclass;

q.      South Dakota Antitrust Law, SDCL ch. 37-1, et seq., with respect to purchases of Augmentin® in South Dakota by members of the 21 Jurisdiction End-User Subclass;

r.      Tennessee Code Ann. §§ 47-25-101, et seq., and/or Tennessee Code Ann. §§ 47-18-101, et. seq., with respect to purchases of Augmentin® in Tennessee by members of the 21 Jurisdiction End-User Subclass;

s.      Vermont Antitrust Law, Vermont Stat. §§ 2453, et. seq. with respect to purchases of Augmentin® in Vermont by members of the 21 Jurisdiction End-User Subclass;

t.      West Virginia Consumer Credit and Protection Act, W. Va. Code §§ 46A-1-101, et seq., with respect to purchases of Augmentin® in West

18

Virginia by members of the 21 Jurisdiction End-User Subclass; and

u.      Wisconsin Antitrust Act, §§ 133.01 et. seq, Wis. Stats., with respect to purchases of Augmentin® in Wisconsin by members of the 21 Jurisdiction End-User Subclass.

71.     Plaintiffs COBA Funds and the 21 Jurisdiction End-User Subclass seek damages and multiple damages as permitted by law for their injuries caused by Defendants' violations of the aforementioned statutes.

## COUNT III

### FOR RESTITUTION, DISGORGEMENT AND CONSTRUCTIVE TRUST FOR UNJUST ENRICHMENT BY DEFENDANT

72.     Plaintiffs repeat and incorporate herein by reference paragraphs 1 through 71 of this Complaint as if fully set forth herein.

73.     This Count is brought by plaintiffs on behalf of the Class.

74.     Defendants have benefitted from the monopoly profits on their sale of Augmentin® resulting from their unlawful and inequitable acts alleged in this Complaint.

75.     Defendant's financial benefits resulting from their unlawful and inequitable conduct are traceable to overpayments for Augmentin® by plaintiffs and the Class.

76.     Plaintiffs and the Class have conferred an economic benefit upon Defendants in the nature of profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of plaintiffs and the Class.

77.     The economic benefit of overcharges and monopoly profits derived from Defendants by charging supra-competitive and artificially high prices for Augmentin® is a direct and proximate cause of Defendants' unlawful conduct.

78.     The financial benefits derived by defendants rightfully belong the plaintiffs and

19

the Class, as plaintiffs and the Class paid anti-competitive and monopolistic prices during the Class Period inuring to the benefit of defendants.

79.     It would be inequitable for defendants to be permitted to retain any of the unlawful proceeds resulting from defendants' fraudulent conduct in obtaining the sham patents and listings in the Orange Book.

80.     It would be inequitable for defendants to be permitted to retain any of the overpayments for Augmentin® made by plaintiffs and the Class which were derived from defendants' unlawful and anti-competitive methods, acts and trade practices, as alleged in this Complaint.

81.     Defendants should be compelled to disgorge into a common fund for the benefit of plaintiffs and the Class all unlawful or inequitable proceeds they have received.

82.     A constructive trust should be imposed upon all unlawful or inequitable monies received by defendants traceable to plaintiffs and the Class.

83.     Plaintiffs and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class and Subclass they seek to represent pray for judgment against defendants for the following relief:

A.     For an order certifying the Class and Subclass pursuant to Federal Rule of Civil Procedure 23, certifying plaintiffs as the representatives of the Class and Subclass and designating their counsel as counsel for the Class;

B.     For an order that defendants' actions violate § 2 of the Sherman Act;

C.     For an order that defendants' actions constitute a violation of the antitrust and/or

20

deceptive trade practice statutes in the 21 Jurisdiction End-User Subclass;

D. For an Injunction enjoining and restraining defendants' continued violation of §2 of the Sherman Act, pursuant to §16 of the Clayton Act;

E. For an order granting plaintiffs and the Class equitable relief in the nature of disgorgement, restitution and the creation of a constructive trust to remedy defendants' unjust enrichment;

F. For an order requiring defendants to pay monetary damages to plaintiffs and the Class as permitted by law;

G. For an order granting plaintiffs' and the Class' the costs of prosecuting this action, together with the interest and reasonable attorneys' fees, experts' fees and costs; and

H. For an order granting such further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all claims so triable asserted in this Complaint.

Date: June 25, 2002

MAGER WHITE & GOLDSTEIN, LLP

_____

Ann D. White
Jayne A. Goldstein
Michael J. Kane
One Pitcairn, Suite 2400
165 Township Line Road
Jenkintown, PA 19046
Telephone: (215) 481-0273
Fax: (215) 481-0271

WOLF POPPER LLP
Lester L. Levy
Jason L. Solotaroff
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Fax: (212) 486-2093

Attorneys for Plaintiffs